(No. 71524

HENRY L. BURKE, Appellee, v. 12 ROTHSCHILD'S LIQUOR MART, INC., *et al.* (The City of Chicago, Appellant).

*Opinion filed May 21, 1992.*

430

432

BILANDIC, J., took no part.

Kelly R. Welsh, Corporation Counsel, of Chicago (Jean Dobrer, Lawrence Rosenthal and Benna Ruth Solomon, of counsel), for appellant.

Pavalon & Gifford, of Chicago (Eugene I. Pavalon, Gary K. Laatsch and Richard L. Kumlin, of counsel), for appellee.

Knight, Hoppe, Fanning & Knight, Ltd., of Des Plaines (Elizabeth A. Knight and Janella L. Barbrow, of counsel), for *amicus curiae* Illinois Governmental Association of Pools.

Scott D. Lane, of Lane & Lane, of Chicago, for *amicus curiae* Illinois Trial Lawyers Association.

JUSTICE MORAN delivered the opinion of the court:

This action was filed by plaintiff, Henry L. Burke (Burke), to recover damages for personal injuries allegedly caused by negligent acts of employees of 12 Rothschild's Liquor Mart, Inc. (Rothschild's), and by willful and wanton conduct on the part of police officers of the City of Chicago (City). The circuit court of Cook County instructed the jury that as a matter of law Burke was not contributorily negligent as to the City. The jury returned a verdict for Burke and against both defendants in the amount of $7,487,000. On another verdict form,

the jury reduced Burke's award against Rothschild's by 32%, the percentage determined to be due to plaintiff's own negligence. The amount recoverable from the City remained at $7,487,000. The appellate court affirmed the judgment (209 Ill. App. 3d 192), and this court granted the City's petition for leave to appeal (134 Ill. 2d R. 315).

The case before us presents two issues. The first is whether a plaintiff's negligence can be compared to a defendant's willful and wanton misconduct to reduce the amount of damages recoverable by the plaintiff, and the second is whether one joint tortfeasor should be required to pay damages caused by the plaintiff's negligence as to the other tortfeasor. Our analysis and conclusions are based on the following facts.

## BACKGROUND

Rothschild's was a liquor and beverage store which also sold other miscellaneous items. On the evening of November 20, 1977, Burke, a 25-year-old shipping department worker, went to Rothschild's in order to purchase some pop for his mother. Burke took two cases of pop from a stack at the rear of the store, placed them on the counter, and left them while he looked at some phonograph records. A Rothschild's employee approached Burke and asked when he was going to pay for the pop. Burke responded that he would pay at some other time. The employee returned the cases of pop to their stack. Burke retrieved the pop and placed it on the counter. Once again the employee returned the pop to its stack and asked Burke for payment. Once again Burke seized the pop and put it back on the counter. Voices were raised. At that point the store manager appeared and told Burke that he would have to leave if he was not going to pay for anything. When Burke tried to push past the manager to take the pop, the manager grasped

Burke by the shoulders and shoved him toward the door. Burke's foot caught on a broken floor tile, and he fell forward, striking his head against a steel panel at the bottom of the door. Burke testified that he was knocked unconscious for a time, and that, on awakening, he became aware that he could not move his arms or legs. Two police officers summoned by the manager arrived as Burke was regaining consciousness, and asked him to get up. According to plaintiff and other witnesses, Burke told the police that he could not get up, because he was hurt. The senior officer, however, testified that Burke said nothing about his injuries at that time. The officer related that Burke did not appear to be seriously injured, but told the officers that they would have to carry him away if they were going to lock him up. The officers called for a paddy wagon. According to the senior officer, Burke told him for the first time of his injuries just as the officers from the paddy wagon were arriving. The officer relayed that information to the paddy wagon officers. Nevertheless, the newly arrived officers sprayed a substance in Burke's face which caused his eyes to burn, seized him by the arms and legs, and dragged him from the store. Burke and other witnesses related that he was dropped on the sidewalk, picked up again, and thrown into the paddy wagon in such a way that his head struck an interior steel wall. Burke testified that, when the paddy wagon stopped, the officers grabbed him by the legs, causing his head to hit the back step of the wagon and the ground, and kicked him while ordering him to stand up. Burke then lapsed into unconsciousness, and did not awaken until he was in Cermak Hospital. As a result of irreversible injury to his spinal cord, plaintiff became permanently quadriplegic. (Henry Burke died on June 23, 1989. His mother has been substituted as plaintiff and appointed special administrator. In order to

avoid confusion, we shall continue to refer to Henry Burke as plaintiff.)

At the close of trial, the court refused the City's proffered instruction, which would have allowed any negligence found on the plaintiff's part to offset the City's damages. Instead, the court granted Burke's motion for a finding that, as a matter of law, Burke was not contributorily negligent towards the City. The court then instructed the jury in accordance with that finding. The jury returned a verdict for plaintiff and against both defendants in the amount of $7,487,000. On a second verdict form, it apportioned fault between the defendants at 65% for Rothschild's and 35% for the City. The jury also found, on a third verdict form, that (1) Burke's total damages against Rothschild's were $4,866,550 (or 65% of the total award of $7,487,000); (2) Burke's own negligence was responsible for 32% of the injury caused by Rothschild's; and (3) Burke's total damages recoverable from Rothschild's were therefore $3,309,254.

Burke and both defendants filed post-trial motions, and the defendants filed amended motions. The City, contending for the first time in its post-trial motion that the defendants were not joint tortfeasors, argued that it was liable for only 35% of the total damages. Alternatively, the City contended that the trial judge had erred in ruling that the City's liability could not be reduced by Burke's negligence. During oral argument on the motion, plaintiff asserted that the jury was properly instructed to find joint and several liability, and that the apportionment figures related solely to defendant's counterclaims against each other for contribution. The court denied the defendants' original and amended motions, and granted plaintiff's motion, amending the third verdict form so that the total damages were $7,487,000 and the amount recoverable from Rothschild's was $5,091,160 (the total damages of $7,487,000 reduced by

32%, or $2,395,840). The court entered a judgment incorporating the amended verdict. The City filed a notice of appeal from the judgment and the denial of its post-trial motions. Rothschild's did not appeal, appear or file a brief in the appeal.

The appellate court affirmed the judgment and rulings of the trial court. However, the court vacated the contribution judgments, holding that they were void because the Contribution Among Joint Tortfeasors Act (the Contribution Act) (Ill. Rev. Stat. 1987, ch. 70, par. 301 *et seq.*) did not apply to causes of action accruing before March 1, 1978. The appellate court also held that negligence cannot be compared to willful and wanton conduct, as there is a qualitative difference between the two forms of conduct. Thus, the court rejected the City's argument that, if it were a joint tortfeasor, it should be liable for only those damages caused by its conduct and that of Rothschild's, and not for damages caused by Burke.

The Illinois Governmental Association of Pools filed a brief, as *amicus curiae*, in support of the City's position, and the Illinois Trial Lawyers Association filed an *amicus curiae* brief supporting the position taken by Burke.

## JOINT OR SUCCESSIVE LIABILITY

Before reaching the other issues before us, we must cross a threshold hurdle first erected by the City and now positioned by Burke. Although this case was tried on a theory of joint and several liability, the City argued in a post-trial motion, and again before the appellate court, that it was a successive tortfeasor, and should thus be liable for only its proportionate share of the damages. In responding to the City's motion, Burke, on the other hand, argued that the jury was properly instructed to find joint and several liability. The appellate court correctly found that, where the City's position be-

fore that court was inconsistent with its stance in an earlier court proceeding, the City had waived its right to complain of an error in the jury instructions. (209 Ill. App. 3d at 201; see *Auton v. Logan Landfill, Inc.* (1984), 105 Ill. 2d 537, 543.) Now Burke argues before this court that the defendants were successive tortfeasors, while the City maintains that it and Rothschild's acted jointly. We deem the argument to be waived by Burke as well as by the City. However, as this court has previously noted, the waiver rule exists as an admonition to litigants rather than as a limitation upon the jurisdiction of the reviewing court. (*American Federation of State, County & Municipal Employees, Council 31 v. County of Cook* (1991), 145 Ill. 2d 475, 480.) Thus we shall address the issue briefly in order to reaffirm and clarify Illinois law.

Plaintiff argues that separate acts of misconduct by the defendants at wholly separate times demonstrate that the City was a successive tortfeasor. To support his theory, plaintiff cites *Gertz v. Campbell* (1973), 55 Ill. 2d 84. In *Gertz*, the plaintiff suffered a broken leg due to the negligent driving of a motorist. The defendant motorist then alleged in a third-party complaint that the treating physician's negligence in delaying surgery led to the necessity of amputating plaintiff's leg. Thus, the motorist asked for indemnity and judgment against the physician for the damages caused by the new injury and aggravation of the original injury. In determining that the motorist and the physician were not joint tortfeasors, the court considered, *inter alia*, that neither had control over the acts of the other, that different duties were owed the plaintiff by each defendant, and that the injuries were sustained at different times. (*Gertz*, 55 Ill. 2d at 89.) However, inherent to the *Gertz* analysis was the recognition that the plaintiff's original injury—a broken leg—could be distinguished from the physician's aggrava-

tion of that injury, which resulted in amputation of the leg. These were separate and distinct injuries, for which defendants could not be held jointly liable.

Before the Contribution Act (Ill. Rev. Stat. 1989, ch. 70, par. 301 *et seq.*) went into effect as to causes of action arising on or after March 1, 1978, contribution judgments were not available to joint tortfeasors. (*Verson Allsteel Press v. Major Spring & Manufacturing Co.* (1982), 105 Ill. App. 3d 419.) Where a second tortfeasor had inflicted an injury successive to the one caused by the original tortfeasor, courts focused upon the severability of the injury when granting partial indemnity. (*Mayhew Steel Products, Inc. v. Hirschfelder* (1986), 150 Ill. App. 3d 328, 330.) However, where defendants, albeit sharing no common purpose or duty, and failing to act in concert, nevertheless acted concurrently to produce an *indivisible* injury to the plaintiff, courts found them to be joint tortfeasors. See, *e.g., Erickson v. Gilden* (1979), 76 Ill. App. 3d 218.

The test of jointness is indivisibility of the injury. (*Storen v. City of Chicago* (1940), 373 Ill. 530, 533.) Section 433A of the Restatement (Second) of Torts states:

> "(1) Damages for harm are to be apportioned among two or more causes where
>
> (a) there are distinct harms, or
>
> (b) there is a reasonable basis for determining the contribution of each cause to a single harm.
>
> (2) Damages for any other harm cannot be apportioned among two or more causes." (Restatement (Second) of Torts §433A (1965).)

The comment to subsection (2) explains:

> "Certain kinds of harm, by their very nature, are normally incapable of any logical, reasonable, or practical division. *** By far the greater number of personal injuries, and of harms to tangible property, are *** single and indivisible. Where two or more causes combine to produce such a single result, incapable of division on any

logical or reasonable basis, and each is a substantial factor in bringing about the harm, the courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm." Restatement (Second) of Torts §433A, Comment *i,* at 439-40 (1965).

In the case *sub judice,* it is incontestable that Burke was injured due to Rothschild's negligence. It is equally indisputable that Burke's injury was exacerbated and/or that he received an additional injury through his subsequent mishandling by the City's employees. There was no clear medical evidence to show either that Burke's irreversible quadriplegia came about solely through negligence of Rothschild's or that the paralysis caused by behavior of Rothschild's was a temporary condition capable of reversal absent the City's misconduct. Either injury or both injuries could have caused plaintiff's lasting condition. Burke's quadriplegia was an indivisible harm. Consequently, we agree that the trial court properly found Rothschild's and the City jointly liable to plaintiff.

## WILLFUL AND WANTON CONDUCT

The City argues that the trial court erred by ruling as a matter of law that the plaintiff was not negligent compared with the City, and that the appellate court erred further by ruling that negligence can never be compared with willful and wanton conduct. After a thorough examination of the record, we believe that the trial court's ruling was most likely based on a finding that Burke's behavior towards the City was in no way negligent. This court has previously stated that "negligence and contributory negligence become questions of law when all of the evidence, viewed in its aspect most favorable to the party against whom the court would rule, is such that reasonable minds would reach the same conclusion." (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d

494, 502.) As evidence of Burke's negligence, the City alleged that, when the police officers first arrived, Burke failed to inform them that he could not move. However, the senior officer testified that, before the paddy wagon arrived, Burke told him that he was hurt. Nonetheless, the paddy wagon officers dragged Burke from the store and threw him into the wagon. Thus, we believe that the trial judge could properly have concluded, on the basis of all the evidence, that Burke was not negligent as to the City. However, because the City had argued during the instructions conference that defendant's damages based on willful and wanton conduct could be reduced by the plaintiff's negligence, we must consider the possibility that the judge's ruling was based on rejection of that proposition rather than simply on his judgment of the evidence. Consequently, we consider the issue in the light in which it was examined by the appellate court.

The City contends that to rule, as did the appellate court, that ordinary negligence cannot be compared with willful and wanton conduct is unfair and at odds with this court's holding in *Alvis v. Ribar* (1981), 85 Ill. 2d 1. With *Alvis*, this State abandoned the contributory negligence defense which had become popular in the 1800s. (Comment, *Pure Comparative Negligence in Illinois: Alvis v. Ribar*, 58 Chi.-Kent L. Rev. 599 (1982).) In the era of contributory negligence, a party seeking to recover damages for a loss caused by negligence was obliged to show that his own negligence did not concur with that of another party to cause the injury. Any degree of contributory negligence by the plaintiff barred his recovery. (*Mueller v. Sangamo Construction Co.* (1975), 61 Ill. 2d 441, 446.) To lessen the harshness of the common law doctrine, Illinois, as well as other States, developed a rule similar to the rule invoked in cases involving a defendant's intentional misconduct. (See 1 Comparative Negligence (MB) §4.30(2) (1992).)

Accordingly, when the defendant's conduct was willful and wanton, the plaintiff's contributory negligence could not be raised as a defense to bar recovery. *Toledo, Wabash & Western Ry. Co. v. McGinnis* (1874), 71 Ill. 346, 348.

The system of pure comparative negligence which this court adopted in *Alvis* was intended to apportion damages according to the relative fault of the parties. (*Alvis*, 85 Ill. 2d at 27.) If a plaintiff were 90% negligent as to the defendant, he would bear 90% of his own damages as well as 90% of the defendant's damages. In 1986, however, through Public Act 84—1431 (Ill. Rev. Stat. 1989, ch. 110, par. 2—1116), the legislature adopted a modified version of comparative negligence. Because the effective date of the act was November 25, 1986, it has no direct bearing on this case. However, we examine it in an effort to ascertain the views of the legislature concerning the applicability of comparative negligence to willful and wanton conduct. The act provides:

> "In all actions on account of bodily injury or death or physical damage to property, based on negligence, or product liability based on strict tort liability, the plaintiff shall be barred from recovering damages if the trier of fact finds that the contributory fault on the part of the plaintiff is more than 50% of the proximate cause of the injury or damage for which recovery is sought. The plaintiff shall not be barred from recovering damages if the trier of fact finds that the contributory fault on the part of the plaintiff is not more than 50% of the proximate cause of the injury or damage for which recovery is sought, but any damages allowed shall be diminished in the proportion to the amount of fault attributable to the plaintiff." Ill. Rev. Stat. 1989, ch. 110, par. 2—1116.

The primary rule of statutory construction is to determine and give effect to the intent of the legislature. (*Stewart v. Industrial Comm'n* (1987), 115 Ill. 2d 337, 341.) The language of the statute itself gives the best in-

dication of that intent. (*American Country Insurance Co. v. Wilcoxon* (1989), 127 Ill. 2d 230, 238.) Where a statute lists the things to which it refers, there is an inference that all omissions should be understood as exclusions, despite the lack of any negative words of limitation. *Department of Corrections v. Civil Service Comm'n* (1989), 187 Ill. App. 3d 304, 310; 2A N. Singer, Sutherland on Statutory Construction §47.23 (Sands 4th ed. 1992).

Section 2—1116 of the Code of Civil Procedure applies to "all actions on account of bodily injury or death or physical damage to property, *based on negligence, or product liability based on strict tort liability.*" (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 110, par. 2—1116.) Because the section makes no mention of willful or wanton conduct, the Trial Lawyers Association, in its *amicus curiae* brief, maintains that we may infer that the legislature had no intention that negligence be compared with such conduct. The City argues, however, that such an interpretation conflicts with the intent of the legislature as shown in the Local Governmental and Governmental Employees Tort Immunity Act (Act) (Ill. Rev. Stat. 1989, ch. 85, par. 1—101 *et seq.*). Amendments to the Act were made in 1986, in response to an insurance crisis which had forced municipalities to close public facilities because of their inability to protect themselves with affordable insurance. See 84th Ill. Gen. Assem., Senate Proceedings, June 30, 1986, at 77-78 (statement of Senator Rock); 84th Ill. Gen. Assem., House Proceedings, July 1, 1986, at 5-6 (statement of Representative Greiman).

As the brief of *amicus curiae* Illinois Governmental Association of Pools points out, many of the protections contained in the Act are couched in terms of willful and wanton conduct. The provision most germane to our inquiry states:

"A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." (Ill. Rev. Stat. 1989, ch. 85, par. 2—202.)

The Association suggests that, if a plaintiff's own negligence cannot be compared with the willful and wanton conduct of a municipal defendant, the municipality will be forced to pay 100% of plaintiff's damages, thus thwarting the purpose of the Act. We note, however, the strongly worded legislative definition of willful and wanton conduct:

" 'Willful and wanton conduct' *** [is] a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." (Ill. Rev. Stat. 1989, ch. 85, par. 1—210.)

The statutory language indicates that the legislature views willful and wanton conduct as being different in nature from simple negligence. Nevertheless, the legislature has barred punitive or exemplary damages against municipalities under section 2—102 of the Act (Ill. Rev. Stat. 1989, ch. 85, par. 2—102). It is evident that the legislature intended to protect municipalities from having to insure against suits for negligence and from paying punitive damages. It is equally evident that the legislature did not intend to shield municipalities whose conduct shows a deliberate intention to cause harm or a complete indifference to the safety of others. We can find no indication in the Act that the legislature, balancing its dual interest in protecting municipalities and protecting the people, intended to reject the deterrent of placing willful and wanton conduct beyond the reach of comparison with mere negligence. However, as the legislature has not spoken definitively, we turn for guidance to common law precedents.

In adopting comparative negligence, this court left the resolution of collateral issues such as the one before us to future cases. (*Alvis*, 85 Ill. 2d at 28.) Our appellate court is in conflict on this issue of first impression.

In *Montag v. Board of Education, School District No. 40* (3d Dist. 1983), 112 Ill. App. 3d 1039, the court gave as its opinion, based on the fact that this court had not addressed the issue in *Alvis*, that the willful and wanton standard was still in effect. (*Montag*, 112 Ill. App. 3d at 1045.) However, in *State Farm Mutual Automobile Insurance Co. v. Mendenhall* (4th Dist. 1987), 164 Ill. App. 3d 58, the court analyzed the issue, noting the possible small differences between negligence and willful and wanton conduct, before concluding that the plaintiff's ordinary negligence could be compared with the defendant's willful and wanton conduct. The court further stated that the fact finder's ability to prorate damages between plaintiff and defendant was consistent with the reasons stated for comparative negligence in *Alvis*. (*Mendenhall*, 164 Ill. App. 3d at 61.) The *Mendenhall* court's ruling was expressly confirmed in *Yates v. Brock* (4th Dist. 1989), 191 Ill. App. 3d 358. However, the conclusion reached in *Mendenhall* and *Yates* was specifically rejected by the appellate court below (209 Ill. App. 3d 192), which noted a strong trend in recent decisions emphasizing the more culpable mental state of defendants responsible for willful and wanton conduct.

In 1983 the Seventh Circuit of the United States Court of Appeals interpreted Illinois law as holding that willful and wanton conduct denotes only a somewhat heightened form of negligence. (*Davis v. United States* (7th Cir. 1983), 716 F.2d 418.) Consequently, the *Davis* court concluded that, since the purpose of comparative negligence is to compare different degrees of negligence, Illinois courts would most likely allow comparison of negligence with willful and wanton conduct. (*Davis*, 716

F.2d at 429.) However, in *Wassell v. Adams* (7th Cir. 1989), 865 F.2d 849, the Seventh Circuit later made a different forecast of the development of Illinois law. After stating that Illinois "appears to be" lining up with the States that allow the plaintiff's simple negligence to be compared with the defendant's willful and wanton conduct, the court noted that only *Mendenhall* had discussed the issue, and that a premise of that decision might be shaky. The critical premise was that there is only a small difference between simple negligence and willful and wanton conduct. (*Wassell*, 865 F.2d at 853.) Noting that other recent Illinois cases had given a stricter definition of willful and wanton conduct, the *Wassell* court concluded that "[i]f the more recent formulations are authoritative, this would undermine the argument in *Davis* and *Mendenhall* for allowing a plaintiff's simple negligence to be compared with a defendant's willful and wanton misconduct." (*Wassell*, 865 F.2d at 854.) In *Downing v. United Auto Racing Association* (1st Dist. 1991), 211 Ill. App. 3d 877, however, the court, noting the hybrid character of willful and wanton conduct, agreed with the *Mendenhall* court that a slight difference in the degree of culpability between plaintiff and defendant should not preclude a comparison of negligence with willful and wanton conduct.

The City urges us to adopt the conclusions of *Mendenhall, Yates*, and *Downing*, as well as those of other jurisdictions which compare negligence with willful and wanton conduct. Some years ago, in *Bielski v. Schulze* (1962), 16 Wis. 2d 1, 114 N.W.2d 105, the Supreme Court of Wisconsin considered relative fault in the context of contribution among joint tortfeasors. The court concluded that all forms of negligence, including conduct that could be termed willful and wanton, should be evaluated on a relative fault basis. In *Martel v. Montana Power Co.* (Mont. 1988), 752 P.2d 140, the Supreme

Court of Montana, noting that the Montana statute governing comparative negligence was borrowed from Wisconsin, adopted the interpretation of the statute made in *Bielski*. Finding that all forms of negligence differ from one another only in degree, the *Martel* court then held that they may be compared with any conduct that falls short of being intentional. *Martel*, 752 P.2d at 143.

Recently, the Supreme Court of New Jersey, in *Blazovic v. Andrich* (1991), 124 N.J. 90, 590 A.2d 222, determined that all fault should be apportioned, even in actions involving intentional tortfeasors. Finding that the various types of conduct differ only in degree, not in kind, the court expressed its confidence that juries would be able to appreciate the difference among them when apportioning fault.

Although the California Supreme Court, in *Li v. Yellow Cab Co.* (1975), 13 Cal. 3d 804, 532 P.2d 1226, 119 Cal. Rptr. 858, failed to come to a conclusion on the issue, the California appellate court has subsequently determined that the comparative negligence principles adopted in *Li* should apply as well where either party's conduct is willful and wanton. (*Sorensen v. Allred* (1981), 112 Cal. App. 3d 717, 169 Cal. Rptr. 441; *Zavala v. Regents of University of California* (1981), 125 Cal. App. 3d 646, 178 Cal. Rptr. 185.) Basic to the court's determination is the belief that willful and wanton conduct is not a separate category, but rather a type of negligence. (*Allred*, 112 Cal. App. 3d at 726, 169 Cal. Rptr. at 446.) The Ninth Circuit of the United States Court of Appeals accepted *Allred*'s conclusions in its interpretation of California law. (*Plyler v. Wheaton Van Lines* (9th Cir. 1981), 640 F.2d 1091.) In like manner, the Eighth Circuit has interpreted Arkansas law to hold that willful and wanton conduct is a form of negligence and thus comparable with other forms of negligence in actions arising under the State's guest statute. (*Billingsley v. Westrac*

*Co.* (8th Cir. 1966), 365 F.2d 619.) The appellate courts of Colorado and of Michigan have come to similar conclusions. *G.E.C. Minerals, Inc. v. Harrison Western Corp.* (Colo. App. 1989), 781 P.2d 115; *Vining v. City of Detroit* (1987), 162 Mich. App. 720, 413 N.W.2d 486.

Plaintiff responds that other jurisdictions, finding a difference in kind rather than degree between ordinary negligence and willful and wanton conduct, have refused to compare the two. As a case in point, plaintiff cites the Supreme Court of Washington's holding in *Adkisson v. City of Seattle* (1953), 42 Wash. 2d 676, 258 P.2d 461. Although *Adkisson* predated the era of comparative negligence, the court's characterization of willful and wanton behavior is germane to our discussion. The *Adkisson* court stated:

> "Wanton misconduct is not negligence, since it involves intent rather than inadvertence, and is positive rather than negative. It is the intentional doing of an act, or intentional failure to do an act, in reckless disregard of the consequences, and under such surrounding circumstances and conditions that a reasonable man would know, or have reason to know, that such conduct would, in a high degree of probability, result in substantial harm to another." (*Adkisson*, 42 Wash. 2d at 687, 258 P.2d at 467.)

Similarly, the Supreme Court of Nevada and the Supreme Court of Wyoming have found a difference in kind between negligence and willful and wanton conduct to support their rulings that the two forms of conduct cannot be compared. *Davies v. Butler* (Nev. 1979), 95 Nev. 763, 602 P.2d 605; *Danculovich v. Brown* (Wyo. 1979), 593 P.2d 187.

The Superior Court of Pennsylvania has specifically declined to follow the *Bielski, Allred,* and *Billingsley* courts' application of comparative negligence principles to willful and wanton conduct. In *Krivijanski v. Union*

*R.R. Co.* (1986), 357 Pa. Super. 196, 515 A.2d 933, the court declared that it would instead continue the long-standing practice of Pennsylvania courts to define willful and wanton conduct as different in kind from negligence.

It is apparent from our review of case law that the term "willful and wanton misconduct" is capable of various interpretations. It is apparent as well that a court's view of willful and wanton conduct as differing from negligence in kind or only in degree is pivotal to its application of comparative negligence principles. Thus, we turn to an examination of the use of the term "willful and wanton" in Illinois law.

At trial of the instant case, the jury was given Illinois Pattern Jury Instructions, Civil, No. 14.01 (2d ed. 1971), which defines willful and wanton conduct as "a course of action which shows actual or deliberate intention to harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others." This definition is virtually identical to that found in the Act (Ill. Rev. Stat. 1989, ch. 85, par. 1—210) and to the pleading requirements for willful and wanton conduct under Illinois case law. See, *e.g., Adkins v. Sarah Bush Lincoln Health Center* (1989), 129 Ill. 2d 497, 518.

This court has expressed its views on willful and wanton conduct in the context of the award of punitive damages. Willful and wanton misconduct " 'approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of it.' " *Loitz v. Remington Arms Co.* (1990), 138 Ill. 2d 404, 416, quoting *Bresland v. Ideal Roller & Graphics Co.* (1986), 150 Ill. App. 3d 445, 457.

Prosser has noted the heightened state of mind required for a finding of willful and wanton conduct. According to Prosser, such behavior is within the penumbra

of "quasi intent," and applies to conduct "which is still, at essence, negligent, rather than actually intended to do harm, but which is so far from a proper state of mind that it is treated in many respects as if it were so intended." (W. Keeton, Prosser & Keeton on Torts §34, at 212-13 (5th ed. 1984).) Illinois courts as well have noted the quasi-intentional nature of willful and wanton conduct. In order to find such conduct:

> "A state of mind different from that needed in ordinary and gross negligence is required and can be found where aggravating circumstances are present, such as where there is a 'conscious and deliberate disregard for the rights or safety of others.' " *Bresland*, 150 Ill. App. 3d at 458, quoting *Morrow v. L.A. Goldschmidt Associates, Inc.* (1984), 126 Ill. App. 3d 1089, 1095.

The Restatement avoids the use of the term "willful and wanton," characterizing all such conduct as "reckless." (Restatement (Second) of Torts §500, Special Note, at 587 (1965).) The differences between reckless conduct and mere negligence are explained in comment *g* of section 500:

> "[Reckless misconduct] differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency, in that reckless misconduct requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man. It differs not only from the above-mentioned form of negligence, but also from that negligence which consists in intentionally doing an act with knowledge that it contains a risk of harm to others, in that the actor to be reckless must recognize that his conduct involves a risk substantially greater in amount than that which is necessary to make his conduct negligent. The difference between reckless misconduct and conduct involving only such a quantum of risk as is necessary to

make it negligent is a difference in the degree of the risk, but this difference of degree is so marked as to amount substantially to a difference in kind." Restatement (Second) of Torts §500, Comment *g*, at 590 (1965).

We subscribe to the Restatement's view that there is a qualitative difference between negligence and willful and wanton conduct. This State has recognized such a difference throughout the years in both statutory and case law. We do not believe that a continued recognition of that difference will betray the principles of *Alvis*, which balanced equal forms of conduct.

In *Simpson v. General Motors Corp.* (1985), 108 Ill. 2d 146, this court declined to consider the application of comparative negligence to a products liability case. As the *Simpson* court stated in reference to *Alvis*:

"The rationale of comparison of fault for the purpose of allocation of damages is that conduct which previously would have barred the plaintiff's claim serves instead to reduce the recovery so that the plaintiff bears the burden of his loss in direct proportion to his fault." (*Simpson*, 108 Ill. 2d at 151.)

Prior to the adoption of comparative negligence, the plaintiff's negligence did not bar damages from a willful and wanton defendant. We believe that the qualitative difference in the defendant's conduct mandates that the plaintiff's negligence should not reduce such damages now.

This court has also ruled that the doctrines of contributory negligence and comparative fault are not relevant in an action under the Structural Work Act. (*Hollis v. R. Latoria Construction, Inc.* (1985), 108 Ill. 2d 401; *Simmons v. Union Electric Co.* (1984), 104 Ill. 2d 444.) In *Simmons*, the court explained that "[a]pplying comparative negligence would be inconsistent with the legislature's intent, which was to provide full compensation for their injuries for workmen covered by the Act."

(*Simmons*, 104 Ill. 2d at 460.) Similarly, we believe that there are policy reasons for failing to compare negligence with willful and wanton conduct. The rationale is similar to that on which the award of punitive damages is based.

Ordinarily, punitive damages may be awarded when the defendant has acted willfully or with wanton disregard for the rights of others. Such damages are allowed as a warning and example to deter the defendant and others from committing like offenses in the future. (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 186.) However, the legislature has immunized municipal defendants against the payment of punitive damages. (Ill. Rev. Stat. 1989, ch. 85, par. 2—102.) We believe that, in the absence of punitive damages, disallowing a setoff for the plaintiff's contributory negligence can serve as an effective deterrent to a municipal defendant's willful and wanton conduct.

After a careful consideration of relevant statutes, case law, and other authority, we conclude that willful and wanton conduct, although sharing some characteristics of negligence, can be distinguished from that type of fault. Willful and wanton conduct is found where an act was done " 'with actual intention or with a conscious disregard or indifference for the consequences when the known safety of other persons was involved.' " (*Lynch v. Board of Education of Collinsville Community Unit District No. 10* (1980), 82 Ill. 2d 415, 430, quoting *Myers v. Krajefska* (1956), 8 Ill. 2d 322, 328-29.) A determination of willful and wanton conduct will be based on the facts of any given case. (See *Spring v. Toledo, Peoria & Western R.R. Co.* (1977), 69 Ill. 2d 290.) Because of the qualitative difference between simple negligence and willful and wanton conduct, and because willful and wanton conduct carries a degree of opprobrium not found in merely negligent behavior, we hold that a plaintiff's, neg-

ligence cannot be compared with a defendant's willful and wanton conduct. Because the question did not arise in this case, we leave to the future a determination of whether a plaintiff's willful and wanton conduct can be compared with the willful and wanton conduct of the defendant.

## JOINT TORTFEASOR LIABILITY

When defendants are found to be jointly and severally responsible for an injury, the plaintiff may elect to satisfy his entire judgment against any one of the defendants. (*Buehler v. Whalen* (1977), 70 Ill. 2d 51; W. Keeton, Prosser & Keeton on Torts §47, at 328 (5th ed. 1984).) The City contends that, if it alone must satisfy the whole judgment, the damages for which it is responsible should not exceed $5,091,160. Holding the City liable for the full $7,487,000 judgment makes it responsible not only for the damages caused by the joint tortfeasors, but for the contributory negligence of the plaintiff as well. The City argues that application of the comparative negligence principles adopted in *Alvis* should preclude such a result.

We have already determined that Burke was properly held not to be contributorily negligent as to the City. Even without our conclusion that a plaintiff's negligence cannot be compared with the defendant's willful and wanton conduct, we would have been unable to find that Burke's instigation of the altercation at Rothschild's was a proximate cause of his mistreatment by the City. Burke's behavior was merely a condition which made possible but did not cause the injuries he received at the hands of the City's agents. (See *Bonnier v. Chicago, Burlington & Quincy R.R. Co.* (1954), 2 Ill. 2d 606; *Lerette v. Director General* (1923), 306 Ill. 348.) Thus, there is no theory under which the City can claim an off-

set for Burke's contributory negligence as to the City's agents.

The City argues, however, that, as a joint tortfeasor, it should benefit from the setoff available to its codefendant. We do not agree. Where one joint tortfeasor is protected against liability by a personal privilege, the liability of the other tortfeasor is not affected. (See Restatement (Second) of Torts §880 (1965).) The same principle can be applied here. If Rothschild's had been immune to liability, the City, as codefendant, would have been responsible for 100% of the award to plaintiff. That Rothschild's was protected by the plaintiff's contributory negligence from liability for 32% of the award does not mean that the City's liability should be reduced as well.

Our appellate court has distinguished the obligation between joint tortfeasors from the obligation of the tortfeasors to the plaintiff. In *Holmes v. Sahara Coal Co.* (1985), 131 Ill. App. 3d 666, the plaintiff, user of a tractor-scraper, brought suit against the machine's manufacturer (Caterpillar) under a theory of strict liability, and against the machine's owner (Sahara) in negligence. The jury entered a verdict against Caterpillar of $200,000, but offset the verdict in the same amount against Sahara by 8.5% to reflect the plaintiff's contributory negligence. Sahara was found liable for 60% of the damages, and for contribution to Caterpillar in the amount of $120,000, which did not include an offset. Sahara appealed, alleging that its contribution judgment as well as its liability to plaintiff should be reduced by the amount of plaintiff's negligence. The court rejected Sahara's argument, stating that "the jury's attribution of 8.5% negligence to plaintiff affects neither Caterpillar's liability to plaintiff nor Sahara's liability to Caterpillar." (*Holmes*, 131 Ill. App. 3d at 676.) Similarly, in the instant case the City's liability to Burke is unaffected by Burke's negligence as to Rothschild's. Accordingly, we hold that, in satisfying

454

the judgment against it as a joint tortfeasor, the City is not entitled to a setoff for Burke's comparative negligence.

For the above reasons, the judgment of the appellate court is affirmed.

*Judgment affirmed.*

JUSTICE BILANDIC took no part in the consideration or decision of this case.